Next case will be 06-5112-5118 Hughes v. El Paso Holding Corporation v. United States Next case will be 06-5112-5118 Hughes v. United States May it please the court. The trial court erred by dismissing the import of the corporate form and by misinterpreting the alleged contract. Turning to the issue of privity, the trial court erred by holding that Mr. Hughes was in privity of contract with the government. The decision was rendered on summary judgment and therefore subject to de novo review also because of the issue of privity itself. Your Honor, turning to the alleged contract documents, they undermine the holding of privity, that Mr. Hughes specifically had privity. The HE-1 application is the alleged offer, Your Honor, and that can be found in the appendix at A-200-343. The only signatures on that application are the holding company's. Mr. Hughes did not sign in his personal form. He did not make any personal signing of the alleged offer. Indeed, Mr. Hughes created the holding company for the specific purpose of taking part in this acquisition, and that's in the record and it's undisputed. It was created just to make this acquisition and shield him from liability. The Federal Home and Bank Board letter is the alleged acceptance. That can be found at A-201-800. That was sent to the thrift and the holding company. It was not sent to Mr. Hughes. It does not mention Mr. Hughes. It makes no reference to Mr. Hughes. The second part of the acceptance is the forbearance letter. These are as found by the trial court. The second part of the acceptance is the forbearance letter. That was sent only to the thrift. It does not mention Mr. Hughes. Thus, the alleged offer and acceptance do not bind Mr. Hughes to anything. There is no obligation that he is incurring under the offers and acceptance. There's no demonstration of mutual intent to contract. Mr. Hughes took full advantage of the court reform, and the holding company could not contractually obligate Mr. Hughes. Now, the trial court relied on the trial court's decision in SoCal. The trial court said, SoCal supports my privity finding. This court then reversed SoCal on that specific issue, thus pulling away one of the legs of the stool that the trial court used to support its conclusion. That undermined the trial court's decision in this case. Indeed, the trial court said that the SoCal decision is indistinguishable factually from the case here. Let me jump around a minute. So in Southern California, they also had an entire agreement clause in that contract, didn't they? In the assistance agreement, Your Honor. Yes. Right, and there's nothing similar here. Yes, Your Honor. So do you – would you agree then that the dividend contract or the dividend agreement is a separate contract, or do you think it's all one contract? The RCMDA is – was signed by the holding company. It wasn't signed by Mr. Hughes. So the first thing is whatever it is, it doesn't give privity to Mr. Hughes because he's not a party to it. The second thing is the plaintiffs told the trial court that was part of this overall agreement. That's what they – and the trial court held that it was. So based on that finding, the RCMDA, Your Honor, yes, should be read as part of it. But it can't be used as a basis of privity for Mr. Hughes because he wasn't a party to that either. SoCal does – But if he's a party to the first, do you think he's also a party to the second? Absolutely, because there is – the trial court found that there's one contract. So if there is a contract, there's one, and RCMDA is, as the plaintiffs allege to the trial court, is a part of that. Thus, under the SoCal decision, Mr. Hughes lacks privity. And under the RCMDA, if he does have privity, he cannot – the successor regulation language in that document prohibits him from recovering based on an alleged breach by FIREA. Now, again, the trial court ruled that the RCMDA didn't apply to Mr. Hughes. It only applied to the holding company, and that's contract interpretation. Again, that's review de novo. The RCMDA, which can be found at A202-198, says, quote, All references to regulations of the Board of the FSLA used in this agreement shall include any successor regulation thereto. So if that is read into the contract as the trial court did, that has to apply to Mr. Hughes as well as to the holding company. And looking at all the facts here, he's personally obligated to contribute 14 pieces of property and $11.5 million and is himself actually liable for some of those when the deal goes sour later. And this is what the government was contracting to acquire. That's why they wanted this deal, to save the savings and loan. They wanted to get Hughes to bring this material in. Why isn't that very clearly a contract? Respectfully, Your Honor, he did not – that is what they argued. But that is – there is no document where he binds himself to do that, and I can demonstrate that to you, Your Honor. If he and the other owners – because he didn't own all those 14 properties. I understand that. If they had not put them into the deal, the question isn't, okay, would we have had a contract we could have enforced at a district court? So we go to the district court and we show them the HE-1 application that he doesn't sign. The Federal Home Loan Bank Board letter that he doesn't receive. And it doesn't mention it. The forbearance letter that doesn't go to him. And we say, look, he has a contract. And he says, no, no, I used the corporate form. You can't sue me. I didn't sign anything. Where is the obligation, the legally binding obligation that we could have enforced against him? It can't be found in any of these documents. The tribe court referred a number of times to internal Federal Home Loan Bank Board memoranda. Well, first of all, the DNN decision says that kind of documentation can't prove a contract. It certainly can't prove a contract contractually obtained on his part because it's all internal. He doesn't receive it or see it or anything. There is no material, not a single scrap, where he commits himself contractually to provide those properties. And indeed, the way that the deal was set up, he was going to put it into the holding company. The holding company was going to put it into the transaction. And that didn't ultimately end up happening. But there was no contract with respect to Mr. Hughes. And if there was, it would have had to have been his overall contract that it contained the RCMDA. They can't have it both ways. What he wants to do is he says this. He says, I wasn't a party to the RCMDA because I didn't sign. So you can't apply that language to me. Well, he did sign it, but he signed it in a different capacity. Exactly. Yes, Your Honor. So he's using the corporate form there to protect himself from the RCMDA. And he says, but I was a party to this overall contract even though I didn't sign anything. And so then he's saying, you can't use the corporate form against me there. And so he's using it as a sword and a shield. And that's now inappropriate. Well, are you saying the properties weren't part of the contract then? Yes, Your Honor. The properties – their contribution was not contractual. That was how the writing was done. There was nothing binding them to make that contribution. That government was willing to just take the risk that they might put 14 properties and $11.5 million in the deal. No, Your Honor. If the thrift had not been capitalized by those properties, then the thrift would have been out of capital compliance. Completely. That's what you were trying to get. The government was trying to get. And you're saying there's no contract that required anybody to do that? The only understanding was regulatory. They sought regulatory approval. The government provided that. And the terms of the regulatory approval was that somebody would provide that capital so that the thrift could go forward. But there was not an enforceable contract to make anybody. Most of these properties were not owned by Mr. Hughes, by other people. And the trial judge acknowledged that those people didn't have privy of contract. So we know that most of the people – for example, the Hacienda building or a variety of other buildings were primarily owned by other people. And they put them into the deal without any contract, as the trial court recognized. So, Your Honor, it's just a question of – it's not a question of whether there was an expectation that the thrift would be capitalized. There was an expectation. The difference is, was there a contractual obligation, which is what Mr. Hughes means, and there wasn't. And to the extent there was any obligation, he was subject to the RCMDA clause. Now, turning to the issue of damages, the trial – it's undisputed that Mr. Hughes doesn't – never owned all of these properties. What he owned was he owned a portion of some, and then he didn't own any of – or he didn't own any of at least one. But, for example – just to give the courting example, Placido Real Apartments. That was owned by a holding company called Technical Properties. Mr. Hughes had a 26 percent ownership of that. Before the deal, Palacio Real upstreamed the ownership. So Mr. Hughes got his 26 percent. The other owners got their 74 percent. And then Mr. Hughes voluntarily put his 26 percent in the deal, just like the other 74 percent owners put theirs in the deal. The trial court gave Mr. Hughes restitution and liens on all 100 percent, even though he never owned, never had control, never took out of his pocket those other 74 percent. He received damages on property he never owned or controlled. Turning finally to the issue of subdebt, if the contractual documents are what the plaintiff said, then the transaction was accepted by forbearance. Ten days after that, under all the documents up until that time, Mr. Steiner was going to buy the subject. That was uncontested. Mr. Steiner was the buyer of the subject. A few days before the deal goes through, Mr. Hughes sends a letter and says, I'd like to take the subject. It's disputed whether the government ever got it, but there's no question the government didn't ask for it. And Mr. Hughes didn't have to send that letter. So the acquisition of the subject had to have been completely voluntary. There was nobody requiring him to do it. It was expected that Mr. Steiner would do it. And as such, under landmark, there's no way he could receive restitution or liens on the purchase of the subject, which was worth $10 million. And with that, Your Honor, I'm into my rebuttal time, so I'd like to say thank you. All right. Mr. Miller. Good morning, Your Honor. John Miller representing Al Hughes and Al Paso Holder. Let me direct myself first to the question of whether or not there was a contract. As I read this court's contract jurisprudence, it basically breaks into two areas. Cases in which the plaintiff is a signatory to the assistance agreement. And those are cases like Mr. and Mrs. Hanson and the two plaintiffs in Castle and Harlem. In cases in which there is a number of documents and agreements all swirling around. And those cases include Southern California Federal, American Capital, Carolyn Hunt Trust, Home Savings, and to a certain extent, Levon and Hanson as well. In those second set of cases, we clearly fall into the second set of cases. To hear Mr. Dintzer argue, you would think that the first set of cases are the only ones that exist. That's not correct. This court has recognized that you look beyond that because in this milieu, this melee of documents, there are many things that are agreements that are not conceptualized in one. And the court has looked at three issues historically in trying to determine whether there was an intent to contract. The trial court in this case first ruled on summary judgment and then went back and listened in a seven-week trial to every aspect of contract formation in this case. Everything from beginning to end and then reaffirmed its decision on the merits. And the three issues that this court has historically looked at are first, who negotiated the contract? Second, was the individual central, essential, or integral to the contract? And third, did the person have legal liabilities under the contract? First, on the negotiation of the contract, if you take a look at the trial court's order, it reflects the key meeting. The key meeting occurred on December 30, 1987, where Mr. Satterfield and Mr. Hughes sat across the table and negotiated the deal. This is the properties I've got. Mr. Satterfield says, will you agree to $10 million personal liability on the cash flow? And if you do, then we'll give you a $35 million valuation. Answered yes, hands shaken, and that's the deal that has survived until today. There could be no stronger evidence that he personally negotiated the contract. The second issue is, is Mr. Hughes integral? Is he crucial? Is he essential? Those cases use different characterizations. Mr. Hughes, in this case, was the sole provider of capital. There was no government financial assistance here. All the capital came through Mr. Hughes. Mr. Hughes put in, ultimately purchased the sub-debt for $11.5 million. He borrowed $10 million from Mr. Sider, for which he ultimately was sued. He signed a $10 million cash flow at $1 million a year. He agreed, ultimately, to handle the properties, to manage the properties over a period of 10 years. He was the chairman and CEO. He guaranteed the $30 million Bright Bank loan, which was used, ultimately, to develop and try to develop Steiner Ranch. Indeed, he was a one-man band. This is not the case. If we take a look at the other cases, where William Simon, the billionaire former Secretary of the Treasury, was a passive shareholder. This is not a second-tier holding company, as we saw in American capital. This is a case in which this person was absolutely essential. Indeed, if he didn't agree to manage the properties, they weren't going to give him the value, and the deal would have fallen through. And the third question, did he take legal obligations under these documents? The district court listened to that, heard it, and concluded that he did. I urge the court to take a look carefully at the letter that was sent with the application, the initial application. He signed it as Alfred Hughes. He signed it as Alfred Hughes. The contract, the underlying supervisory, the underlying merger and acquisition agreement, he signed it. It's got Hughes and El Paso holding. Hughes is defined as Alfred Hughes. If we're going to place this much emphasis on Mr. Hughes, how do we deal with the fact that on six of the 14 properties, he only owned 26 percent, one of them 50 percent, three of them he's just a trustee, shouldn't the damages have been calculated on his percentage, not the entire value of these properties? Your Honor, when a person... If he's the central person here and we're looking at him, how do you account for the fact that he doesn't own a lot of this property? Your Honor, the undertaking, his legal undertaking under the contract, first of all, the trial court found after the trial here, the seven-week trial, that the application and all of the amendments were basically collapsed into the offer. That's the way the court looked at it. Let's ask ourselves, what was Mr. Hughes' obligation under the agreement? Was his obligation under the agreement to only give what he owned, or did he oblige himself under the agreement to provide $35 million of real estate value, however he got it, whether he borrowed it, as in West Fed, whether he got it from his own resources, if he owned it all himself, or whether he traded for it. It doesn't matter. In these circumstances, for example, in Steiner Ranch. Steiner Ranch had equity that was worth, say, $50 million. Mr. Hughes had the ability, because he had an option on Steiner Ranch, to buy it for $22 million. He took that option and basically gave the option to El Paso. He says to El Paso, you pay the money and exercise the option. Yes, he didn't own Steiner Ranch, but he owned value. He owned value, just like he owned a stock option. If you have an option, an in-the-water option, you can sell it. And there's inherent value in that. The question is, are we valuing the value of that option or the value of the entire property, which seems to be there's a distinction there, isn't there? Yes, absolutely there is, Your Honor. With respect to Steiner Ranch, what the analysis would be, Mr. Hughes, even if he didn't own Steiner Ranch, and he caused it to be contributed, and he caused it to be contributed, in effect, in a bargain sale, he had the option to buy Steiner at, say, $15 million, less than its fair market value. He contributes that option to El Paso. El Paso exercises that option and buys Steiner. Isn't he putting in enormous value? He's putting in value. There's no question of that. But is the value the entire value of the ranch? No. No, Your Honor. It is not. Under those circumstances, all we're seeking to recover is the net value. The net value. That's all that we're seeking to recover with respect to each property. Why isn't that true, then, of the 14 properties, when six of them, he only owns 26 percent? Why is he getting the other 72? Because fundamentally, that's the law of restitution. The law of restitution provides that if there is a breach of a contract, the non-breaching party has the right to recover. There's two possible things. One is the cost he incurred, and the other is the benefits that were conferred. Those are the two issues. The government argues in this case, and I think you put your finger right on the issue. In essence, the government argues in this case that it's a windfall to Mr. Hughes if he gets recovery, not for the cost that he incurred, but rather for the benefit that he conferred on the government, which everybody agrees now is 46.5. There is no dispute on the valuation. They say, we got 46.5, but he didn't give it. It didn't come out personally of his pocket. It didn't cost him 46.5. Therefore, he should not recover. That's the thesis, really the thesis of their argument. And the court will indulge me very briefly. May I just read this and then respond to your question, Judge Moore? The government argues on its cross appeal. This is in Landmark at page 1372, 256F3rd. On its cross appeal that the trial court's calculation of the award was improper because it was based on the value of the benefits that the government received from Landmark's performance under the contract. The government argues that under ACME, an award against the government can only be based upon the cost of performance standards. We find nothing in ACME to support the government's position. And even assuming arguendo that this court's predecessor had so held in ACME, that holding was overruled by mobile oil. There, the court held that the plaintiffs were entitled under restitution. You know, your time is running. We can read the opinion. Why don't you respond to Judge Moore? May I just finish one last sentence? Why don't you respond to Judge Moore? I'm sorry, Your Honor. Well, I mean, you're discussing damages, and I'm still back struggling over whether or not Hughes should get anything at all. So I think that if you don't mind, I'd like to bring you back to the liability before you lose up all the time. My question is really getting to whether this is one overarching contract. I assume you're happy that the CFC said the dividend agreement. I call it a dividend agreement. RCMDA was not part of the contract, right? That's correct. Okay, but here's my problem. Would you say the approval letter was part of the contract? The approval letter was certainly part of the overall issues. Yes, the approval letter was part of the contract. You seemed to say that earlier in the brief, so I thought you agreed with the brief. Yes, that's correct. So if the approval letter is part of the contract, the approval letter says expressly this approval is expressly conditioned upon compliance with all relevant regulations. Isn't there a regulation that says a dividend agreement must be signed by the parties as part of this? I believe that it's in a regulation, but it's called a policy statement. And in the other cases in which the court has found that there's been an express and I think I'm back in Admiral, I think it's in Admiral, there's both you must comply with all regulations and there's also a provision in there that says that you need an RCMDA. But I don't think it's technically a regulation. It's a statement of policy. But I think I submit to you, Your Honor, that if it were to be read to incorporate all regulations, that would change the contract fairly dramatically. Well, the approval letter says expressly conditional compliance with relevant regulations. And one of the regulations in my reading suggested, and I'll look at it again, but suggested that it said a dividend agreement had to be signed by the parties. Now, I agree with you in other cases it might be that the dividend agreement was explicitly mentioned in the overarching contract. And here that's not the case. That's correct. But I'm just wondering whether the statement in the approval letter that conditions approval on compliance with relevant regulations and the fact that there is a regulation that says you have to have a dividend agreement, why wouldn't then Hughes be unnoticed that there's a dividend agreement such that it should bind to him as part of the contract the same way it would bind the other parties? Your Honor, I don't believe. I think that, in fact, in the Winstar jurisprudence there are a number of cases in which there are either no, there are limited network maintenance agreements, or network maintenance agreements were set aside. It's a policy that they negotiated in some cases or requested in some cases with the holding company and not in others. What I'm saying is that I don't believe that the way that the regulation was, the rule was issued, it was not an absolute requirement, and it wasn't put in the approval letter as an absolute requirement. So if the approval letter said you must sign a dividend agreement conditioned on the approval, you would agree, of course, then the dividend agreement would be part of the contract. I would agree that it would be part of the contract, certainly as it applies to El Paso. But you think it's too attenuated to say all regulations need to be met with in order for approval to exist? I agree with that position, Your Honor. Let me... You wanted to say two minutes, so you want to go back now? Your Honor, I do want to answer one question and just give a hypothetical that I think illustrates my point with respect to restitution. I know I'm cutting into my rebuttal time. If the government wanted to buy a car from me for $10,000 and my father said that he was prepared to give the car to the government and he did transfer the car to the government, and the government then said, I'm not going to pay. I sued for restitution for $10,000. The argument that the government says is, you never owned the car. There was no cost to you to the car, and therefore you can't recover the $10,000. That's not the law of restitution, because the law of restitution says it's the benefit conferred that the plaintiff is able to recover. And in that particular instance, I confer the $10,000 benefit. The law of remedies does not put on the breacher the ability to keep the $10,000. The innocent party is the one who can do it, and theoretically, under those circumstances, I could have asked my father to sell the car to Carmax, a used car dealer, and received the $10,000 just the way that the other members of the Hughes family could have used that in order to... Mr. Hughes could have asked them to take their real estate and take it elsewhere. Finally, I would say on the corporate form issue, in a case in which Mr. Hughes put virtually everything he and his family owned into this and cost him everything, it would be inappropriate to rely upon corporate forms to deny recovery. All right. Thank you. Thank you, Your Honor. Mr. Disser. Counsel, can you start right with the point that I brought up with him, if you don't mind? Just going to... Okay. If I could, just to clarify, the trial court found that the RCMDA was part of the contract, and I'm reading this as the trial court's opinion at 312. Because El Paso's application to acquire El Paso Federal, Federal Home and Bank Board's approval letter, the forbearance letter, and the RCMDA are part of the contract, it is clear that El Paso is in privity with the government. So the RCMDA was actually the basis, or part of the basis, of the trial court holding that the holding company had privity. So, Your Honor, the... And why did Hughes... Why was Hughes not subject to the dividend agreement then? What the trial court said was... Yeah, but if it's all part of one contract... Absolutely, Your Honor. If it's all part of one contract, you can't... And basically, he didn't sign anything. So if that was the scene or going on, then that... We believe it was unfair to make that the requirement. That was the trial court's rationale. Turning to the... Turning to the issue of damages. Well, actually, one more point. My colleague said that the deal he described was when Mr. Hughes shook hands with Mr. Satterfield. If you'll notice, he didn't mention goodwill at that. Because that discussion had no relevance, no discussion about goodwill. What happened in that discussion was a valuation of the properties, and Mr. Hughes saying... The government being a little concerned about the valuation of the properties, and saying, okay, but you have to sign something that guarantees that the properties will have certain cash flow. That handshake discussion did not involve goodwill. And so to the extent that there was anything, it was not a discussion about this overall agreement. Mr. Hughes wanted to be party to a contract. All you had to do was sign something. But he didn't. He didn't sign... And the agreement of obligation that he did sign says expressly that it can't be used for anything, using the words, whatsoever, other than to enforce the agreement of obligation. It incorporates nothing. Turning to the issue of damages. Mr. Hughes obviously did not contractually obligate himself to put $35 million in it because he didn't sign anything. But he didn't have the $35 million. He didn't get somebody else... He didn't borrow it like in Westfield. You borrow it and you get it so you have your personal obligation. He didn't do that. What he did was he asked some people, and they decided they would. And that's exactly what happened in Castle. That's exactly what happened in Anderson. That's exactly what happened in SoCal. They had people making voluntary, independent decisions to put the property in the deal. The trial court held these other people were not in privy to contract with the government. They did not have an obligation. If the property hadn't come in, we would have no action against them. There is no finding in trial court as to the actual cost of Mr. Hughes' contributions to Mr. Hughes. So he's saying, oh, it cost him. It didn't cost him. There's no finding on it. And if there was, it would be based on the actual values of the property. He spoke of the Steiner Ranch. Steiner Ranch, Part Track B, the part that was contributed, was broken in half. Half Mr. Hughes contributed. Half was contributed by a gentleman by the name of Buck Steiner. And he got $11.5 million for that. He contributed for $11.5 million. That was never touched by Mr. Hughes. He got restitution and reliance based on something he never owned and never contributed. And that whole idea that my colleague at the bar is talking about was unjust enrichment or the benefit of the bargain or benefit conferred, it wasn't a benefit conferred by Mr. Hughes. Even those cases that discuss that, and we respectfully disagree with that idea under restitution, even those cases, it's a benefit conferred by the plaintiff. If Joe comes in and decides to confer a benefit, I can't say, well, I'm going to sue for that benefit too. And that's what Mr. Hughes is asking for. Millions of dollars conferred by other people. As far as the court has asked about the option, the option was not contributed, just so the court knows, it was waived. The option was waived, and you could find that at appendix 107983 and A203114. Never contributed. What was contributed was the two parts of the Steiner ranch, a half of which was contributed through Mr. Hughes and the other half through Buck Steiner. There's no explanation. For example, Hacienda, which Mr. Hughes owns zero of, it was contributed by Brenda Hughes, by Brenda Hughes Management Trust. There's no explanation for why Mr. Hughes Now he was later sued by Steiner, right? He was, Your Honor. So does that show personal liability here? What he was sued on, Your Honor, was a personal note that he gave to Mr. Steiner to buy some of this property that he himself contributed. The restitution reliance wasn't based on how much he promised to give to Mr. Steiner. It was based on the contribution. But if it was based just on that promissory note, which was a separate agreement between two people, his damages would have been limited to the $10 million there. In fact, under the Steiner ranch, he got quite a bit more than that. All right. Thank you. Thank you very much, Your Honor. The case is submitted.